UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH CENTRAL DIVISION

|  |  |
|---|---|
| WESLEY GILLIES, LOGAN STAHELI, MADISON JONES, AND CARLY STAHELI, in their individual capacity and as heirs of the Estates of Z. Todd Staheli and Michelle Davis Staheli,<br><br>        Plaintiffs,<br><br>        v.<br><br>PETRÓLEO BRASILEIRO S.A., a Brazilian corporation; and DOES 1-20,<br><br>        Defendants. | **ORDER AND MEMORANDUM DECISION GRANTING MOTION TO DISMISS AMENDED COMPLAINT**<br><br>Case No. 2:22-cv-00124-TC<br><br>Judge Tena Campbell |

The Plaintiffs in this case are Wesley (Staheli) Gillies, Logan Staheli, Madison (Staheli) Jones, and Carly Staheli (collectively "Plaintiffs"). They are the now-grown children of Z. Todd Staheli ("Todd") and Michelle Davis Staheli ("Michelle"). In 2003, Todd and Michelle were murdered in Brazil while Todd was there working for a subsidiary of Shell Oil Company. Plaintiffs allege the murders "were orchestrated and carried out at the behest of the executives, employees, directors, and officers of [Defendant] Petróleo Brasileiro, S.A. ("Petrobras")." (Am. Compl., ECF No. 16 at 2). Plaintiffs seek "compensatory, punitive, and other damages from the persons and entities responsible for the murders of their parents." Id. at 3.

Before the court are Petrobras' Motion to Dismiss Plaintiffs' Complaint, (Mot. Dismiss Compl., ECF No. 11), and its Motion to Dismiss Plaintiffs' Amended Complaint, (Mot. Dismiss Am. Compl., ECF No. 17). In both it has moved to dismiss on several grounds including subject matter jurisdiction. The court has carefully reviewed the parties' arguments and the applicable

law.  The court finds that under the Foreign Sovereign Immunities Act of 1976 ("FSIA"), it lacks subject matter jurisdiction over Plaintiffs' action and is without power to proceed with this case.

## BACKGROUND

### I.        Plaintiffs' Allegations Against Petrobras.

In 2003, Todd, Michelle, and their four children were living in Brazil.  (See Am. Compl. ¶¶ 1–6, 25).  They were all American citizens and Utah residents.  Id. ¶¶ 1–6.  "During the early morning of Sunday, November 30, 2003, Todd and Michelle were beaten to death in their home in Rio as they slept in their bed while their four children slept in their rooms just down the hallway."  Id. ¶ 42.  Logan found them; Todd was already dead, while Michelle died at a Rio hospital four days later.  Id. ¶¶ 47–49.  Wesley was thirteen years old when her parents were murdered, Logan was ten, Madison was eight, and Carly was three.  Id. ¶¶ 1–4.

Todd had been sent to Brazil by his employer, Shell Oil Company ("Shell"), a subsidiary of Royal Dutch Shell.  Id. ¶ 21.  He was sent there, with his family, to find out the basis of the cost overrun losses Shell was experiencing in the joint ventures it had with Petrobras and to fix the problems.  Id. ¶ 24.  Todd discovered that an extensive bribery and corruption scheme underlay the overruns, and "Just as Todd began to uncover [Petrobras'] massive fraud and took steps to prevent further financial harm to Shell, he and Michelle were killed."  Id. ¶ 41; see also id. ¶ 126 (alleging Petrobras admitted corrupt schemes occurred "at or around the time Todd uncovered Petrobras' corruption and was murdered to keep his discovery a secret."); id. ¶¶ 134–43 (asserting motive for the murders was "to prevent Todd from exposing what would become the largest bribery and kickback scheme in Brazilian history.").

An extensive coverup occurred in the wake of the murders.  First, "police in Rio tried to pin the killings on the two oldest [Staheli] children—Wesley, 13, and Logan, 10."  Id. ¶ 54.

2

Police next framed a handyman.  Id. ¶¶ 61, 63, 162.  In characterizing the role of the police, Plaintiffs not only allege that the police were involved in covering up the murders after the fact, they also allege the Chief of the Rio Civil Police and the State Secretary for Public Security for the State of Rio de Janeiro "were attempting to frame the children, and later [the handyman], for the murders to distract from their own involvement in ordering and carrying out the murders." Id. ¶¶ 68, 70.  Also implicated, somewhat indirectly, are the then-President of Petrobras subsidiary Gaspetro (Petrobras Gás S.A.), as well as the then-President of Brazil (who is also the current Brazilian President).  See id. ¶¶ 36, 84–88.

The corruption and fraudulent schemes that Plaintiffs assert were first discovered by Todd in 2003, came to light more broadly "beginning in 2014 or earlier when Brazilian Federal Police, under Operation 'Lava Jato' started arresting participants in these illegal activities."  Id. ¶ 74. "In 2020, the Brazilian government halted the Operation Lava Jato investigations and prosecutions, claiming that all corruption had been addressed and corrected."  Id. ¶ 106. Plaintiffs assert no attempt has been made to address or investigate the Staheli murders or their connection to Petrobras' corruption.  Id.  In the United States, the United States Securities and Exchange Commission (SEC) brought enforcement actions and monetary sanctions against Petrobras "for these same corruption schemes and securities fraud."  Id. ¶¶ 112–16.  The Department of Justice (DOJ) also investigated Petrobras.  As part of a DOJ-Petrobras non-prosecution agreement (NPA), Petrobras admitted, among other things, that it violated books and records and internal control statutes, received bribes, and facilitated and directed millions of dollars in corrupt payments to Brazilian politicians and political parties.  Id. ¶¶ 121–25.[1]

---

[1] As part of the NPA, Petrobras agreed to ongoing reporting obligations and continued cooperation with the DOJ in investigations and prosecutions relating to its corruption and bribery scheme; Plaintiffs allege Petrobras has not disclosed or reported the allegations related to the

II.        **The Three Causes of Action Brought By Plaintiffs Against Petrobras.**

Plaintiffs bring three causes of action against Petrobras and Does 1–20.[2]  Plaintiffs bring an action for wrongful death under Utah Code Ann. § 78B-3-106.  Id. ¶¶ 165–174.  Plaintiffs also bring a cause of action for civil conspiracy.  Id. ¶¶ 175–181.  They allege Petrobras, through its executives, officials, employees and agents, and the Doe Defendants, conspired to prevent Todd from revealing the bribery and corruption scheme, and to achieve this, these Defendants ordered the murders of Todd and Michelle.  Id. ¶¶ 176–77.  Finally, Plaintiffs bring a cause of action for intentional infliction of emotional distress.  Id. ¶¶ 182–87.  They allege that Petrobras and the Doe Defendants intentionally engaged in extreme and outrageous conduct by engaging in a scheme to murder Todd and Michelle, purposefully and intentionally causing severe emotional distress to Plaintiffs.  Id.  They argue "The brutality of the killings just yards from where Plaintiffs slept, the trauma of finding their parents murdered in their own blood-soaked bed, and the publicized attempt to blame Wesley and Logan for the murders of their own parents caused Plaintiffs to suffer severe emotional pain."  Id. ¶ 185.

<u>**ANALYSIS**</u>

I.        **The Court Considers the Merits of the Amended Complaint.**

Petrobras argues that the court should dismiss Plaintiffs' claims under DUCivR 7-1(f) because Plaintiffs improperly amended the Complaint and did not respond to Petrobras' first

---

Staheli murders, and this failure is a violation of the NPA that "may be separate criminal violations under United States laws."  Id. ¶¶ 127–33.

[2] "Does 1 through 20 . . . are persons whose wrongful conduct is presently unknown or not fully known to Plaintiffs at this time and who caused Todd and Michelle to suffer injury and death, including without limitation: (1) corporate officers, directors, employees or agents of Petrobras; (2) government officials in Brazil and directors, employees and agents of the Rio Civil Police who were directly involved in the planning, execution, and cover-up of the murders; and (3) other persons, whose acts and/or omissions proximately caused or proximately contributed to cause Plaintiffs' injuries . . . ."  Id. ¶ 10.

motion to dismiss.  Plaintiffs filed their Complaint on February 23, 2022.  (Compl., ECF No. 2).

Petrobras moved to dismiss it on July 22, 2022.  (Mot. Dismiss Compl., ECF No. 11).  Then,

Plaintiffs filed their first Amended Complaint on September 30, 2022.  (Am. Compl., ECF No.

16).  Petrobras moved to dismiss it on October 14, 2022.  (Mot. Dismiss Am. Compl., ECF No.

17).  Plaintiffs neither sought Petrobras' consent nor the court's leave to amend.  As a result, the

way Plaintiffs amended their complaint was in violation of the local rules.  See DUCivR 15.

But dismissal is a disproportionate sanction.  This is particularly because, as Petrobras

points out, the amendments made were inconsequential.  (Mot. Dismiss Am. Compl., ECF No.

17 at 1).  Since the complaints are the same apart from these inconsequential differences, there is

little prejudice to Petrobras in the court considering the Amended, rather than the original,

Complaint in assessing whether dismissal is appropriate.  Further, Petrobras concedes that the

court can accept the Amended Complaint.  Id.  Finally, the Motion to Dismiss the Amended

Complaint is fully briefed.  Plaintiffs filed a memorandum opposing the Amended Complaint's

dismissal, (Mem. Opp. Mot. Dismiss Am. Compl., ECF No. 22), and Petrobras filed a reply in

support of its dismissal, (Reply Supp. Mot. Dismiss Am. Compl., ECF No. 25).  For these

reasons, the court declines to dismiss because of the improper amendment and it treats the

original complaint as superseded by the Amended Complaint.  See Davis v. TXO Prod. Corp.,

929 F.2d 1515, 1517 (10th Cir. 1991).

Any motion that is directed at the original complaint is rendered moot by the filing of an

amended complaint.  White v. City of Topeka, No. 18-4050, 2019 WL 3546469, at *1 (D. Kan.

Aug. 5, 2019).  Consequently, Petrobras' Motion to Dismiss the Complaint (ECF No. 11) is

moot.  The court will decide whether to dismiss Plaintiffs' claims based on how they are pleaded

in the Amended Complaint.

II.     **The Court Lacks Subject Matter Jurisdiction Under FSIA Because the Commercial Activity Exception Does Not Apply.**

Petrobras is a foreign state and an agency or instrumentality of a foreign state under FSIA.  (Am. Compl., ECF No. 16 ¶ 8 (citing 28 U.S.C. § 1603(a); 28 U.S.C. § 1603(b)).  "FSIA provides the exclusive basis for obtaining jurisdiction over claims against a foreign state or its instrumentalities in the United States."  Hansen v. PT Bank Negara Indonesia (Persero), 706 F.3d 1244, 1248 (10th Cir. 2013) (citing Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 611 (1992)).  Under FSIA, a foreign state is "presumptively immune from suit."  Orient Min. Co. v. Bank of China, 506 F.3d 980, 991 (10th Cir. 2007) (citing 28 U.S.C. § 1604).  "But the FSIA 'carves out certain exceptions to its general grant of immunity.'"  Id. (quoting Republic of Austria v. Altmann, 541 U.S. 677, 691 (2004)).  Because Petrobras is a foreign state under FSIA, it is immune from suit in federal courts, unless a statutory exception applies.  Id.  Plaintiffs argue such an exception is implicated here: the commercial activity exception.[3]

The parties do not dispute that Petrobras is a foreign state as defined by FSIA, meaning Petrobras has made a prima facie showing of sovereign immunity.  Consequently, "plaintiffs bear the burden of showing a specific exception of the FSIA . . . confer[s] subject matter jurisdiction upon this court."  Southway v. Cent. Bank of Nigeria, 994 F. Supp. 1299, 1305 (D. Colo. 1998), aff'd and remanded, 198 F.3d 1210 (10th Cir. 1999).  Courts within the Tenth Circuit interpret a foreign state's motion to dismiss on the grounds that the statutory exceptions contained in FSIA do not apply to that state's relevant conduct and that the foreign state is

---

[3] Petrobras also argues the noncommercial tort exception does not apply.  (Mot. Dismiss Am. Compl., ECF No. 17 at 11–12).  Plaintiffs respond, "While an argument can be made that the plain reading of the provision supports jurisdiction in this case, Plaintiffs do not press that position in this proceeding."  (Opp. Mot. Dismiss Am. Compl., ECF No. 22 at 6 n.4).  Because Plaintiffs have not made any argument to contradict Petrobras' plausible points on this issue, the court treats the argument that the noncommercial tort exception applies as waived.

immune from suit as facial challenges to the sufficiency of the complaint.  Id. at 1306.  Where a defendant challenges the legal sufficiency of a plaintiff's jurisdictional allegations, "then the district court should take the plaintiff's factual allegations as true and determine whether they bring the case within any of the exceptions to immunity invoked by the plaintiff."  Mwani v. bin Laden, 417 F.3d 1, 15 (D.C. Cir. 2005) (quoting Kilburn v. Socialist People's Libyan Arab Jamahiriya, 376 F.3d 1123, 1127 (D.C. Cir. 2004)).

a.  FSIA's Commercial Activity Exception.

"The 'commercial activity' exception is the FSIA's 'most significant . . . exception[ ]' to foreign sovereign immunity."  Orient Min., 506 F.3d at 992 (quoting Weltover, 504 U.S. at 611) (alterations in Orient Min.).  "It 'is at the heart' of the FSIA's codification of the restrictive theory of foreign sovereign immunity."  Id. (quoting Joseph F. Morrissey, Simplifying the Foreign Sovereign Immunities Act: If a Sovereign Acts Like a Private Party, Treat It Like One, 5 CHI. J. INT'L L. 675, 682 (Winter 2005)).[4]  "FSIA allows federal courts to exercise jurisdiction over foreign states when such states engage in certain 'commercial activities,' with direct effects in the United States."  Hansen, 706 F.3d at 1248 (quoting 28 U.S.C. § 1605(a)(2)).

"FSIA's 'commercial activity exception is broken down into three clauses,' each identifying a sufficient connection to the United States necessary 'to satisfy the jurisdictional nexus requirement.'"  Orient Min., 506 F.3d at 992–93 (quoting Voest–Alpine Trading USA Corp. v. Bank of China, 142 F.3d 887, 892 (5th Cir. 1998)).  The third clause—the "direct effect" clause—is at issue in this case.  The direct effect clause provides that,

---

[4] This theory "provide[s] that 'the sovereign immunity of foreign states should be "restricted" to cases involving acts of a foreign state which are sovereign or governmental in nature, as opposed to acts which are either commercial in nature or those which private persons normally perform.'"  Devengoechea v. Bolivarian Republic of Venezuela, 889 F.3d 1213, 1220–21 (11th Cir. 2018) (quoting H.R. Rep. No. 94-1487, at 14 (1976)).

> A foreign state shall not be immune from the jurisdiction of courts of the United States or of any of the States in any case—in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

In assessing subject matter jurisdiction when the "direct effect" clause is at issue, courts must first identify the particular conduct on which the plaintiffs' action is based. Orient Min., 506 F.3d at 993, 996–97. For example, in Orient Mineral, the Tenth Circuit began its analysis of foreign sovereign immunity under the direct effect clause by noting that it had to consider "what specific acts the [foreign state] took in [the foreign jurisdiction] that underlie Plaintiffs' claims," even though in that case it was clear that the foreign state at issue was carrying on commercial activity in that state. Id. at 996–97. It was only once the Tenth Circuit pinned down the foreign state's specific acts that underlay the plaintiffs' claims, that the Circuit moved on to what it called "the dispositive question": "whether this [foreign state] conduct, taken in [the foreign jurisdiction], had a direct effect in the United States." Id. at 997 (emphasis added).

Accordingly, the court first considers what specific acts Petrobras took outside the United States that underlie Plaintiffs' claims. Only once it has identified these specific acts will it move on to the dispositive question of whether those acts had a direct effect in the United States.

b.  Determining What Plaintiffs' Claims Are "Based Upon."

"[F]or FSIA purposes, the statutory phrase 'based upon,' 'is read most naturally to mean those elements of a claim that, if proven, would entitle [Plaintiffs] to relief under [their] theory of the case.'" Id. at 993 (quoting 28 U.S.C. § 1605(a)(2); Saudi Arabia v. Nelson, 507 U.S. 349, 357 (1993)). Put differently, "The Supreme Court has explained that, within the meaning of § 1605(a)(2), 'an action is "based upon" the "particular conduct" that constitutes the "gravamen"

of the suit.'"  Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC, 813 F.3d 98,

107 (2d Cir. 2016) (quoting OBB Personenverkehr AG v. Sachs, 577 U.S. 27, 35 (2015))

(cleaned up).  This understanding of "based upon" comes from Nelson.  507 U.S. at 357.  It was

developed in the context of one of the commercial activity exception's other clauses, but courts

"have applied Nelson's understanding of § 1605(a)(2)'s 'based upon' requirement in the context

of the third clause of that provision," which is the direct effect clause.  Atlantica Holdings, 813

F.3d at 107 n.3 (citing Kensington Int'l Ltd. v. Itoua, 505 F.3d 147, 155 (2d Cir. 2007)).

 The fact that an activity "would establish a single element of a claim," does not make that

activity the gravamen of the suit.  Rosenkrantz v. Inter-Am. Dev. Bank, 35 F.4th 854, 862 (D.C.

Cir. 2022) (quoting Sachs, 577 U.S. at 34).  The Supreme Court has instructed courts not to

merely use a claim-by-claim, element-by-element analysis of a cause of action to determine what

a suit is "based upon," and it has rejected a single-element approach to determining the gravamen

of a case.  Id. at 862–63.  "[C]ourts [are] to instead examine [a] plaintiff's asserted claims and

'zero[ ] in on' the wrongful conduct on the part of the defendant that 'actually injured' the

plaintiff."  Id. at 863 (quoting Sachs, 577 U.S. at 35).  "The mere fact that an activity 'led to the

conduct that eventually injured' the plaintiff does not necessarily make that activity the

gravamen of the suit."  Id. at 862 (quoting Nelson, 507 U.S. at 358).  Rather, a "court must

separate antecedent conduct that is related to a wrongful act from the conduct that actually forms

the 'foundation' of the claim."  Exxon Mobil Corp. v. Corporacion Cimex S.A., 567 F. Supp. 3d

21, 24 (D.D.C. 2021), mot. to certify appeal granted, No. 19-CV-1277, 2021 WL 6805533

(D.D.C. Nov. 23, 2021) (citing Sachs, 577 U.S. at 36; Nelson, 507 U.S. at 358).

//

//

9

c.   <u>What Plaintiffs Claims Are "Based Upon" for the Purpose of the FSIA.</u>

Under these rules, the wrongful conduct on the part of Petrobras that actually injured the Plaintiffs, and that constitutes the gravamen of their claims, are the following acts: (a) the conspiracy to commit the murders of Todd and Michelle, (b) the murders themselves, and (c) the coverup of the murders, which included framing some of the Plaintiffs for these horrific crimes.[5] This is what forms the foundation of Plaintiffs' claims, which are for (a) civil conspiracy, (b) wrongful death, and (c) intentional infliction of emotional distress.  (<u>See</u> Am. Compl., ECF No. 16 ¶¶ 165–87).  The overarching Petrobras corruption and bribery scheme is related to the wrongful conduct that injured Plaintiffs.  Plaintiffs allege it led to the conduct that eventually injured them, and at this stage the court assumes that is true.  But the fraudulent financial activities are not the gravamen, or crux, of the suit.  Consequently, those acts are not what Plaintiffs' claims are "based upon" within the meaning of FSIA's commercial activity exception.

The conclusion that the gravamen of the suit is the murders, the conspiracy before, and the cover-up after, is reinforced by looking at Plaintiffs' claims.  The civil conspiracy claim alleges that the conspiracy aimed to "prevent Todd from revealing the massive bribery, kickback and corruption scheme involving hundreds of millions of dollars by Petrobras."  <u>Id.</u> ¶ 176.  "To achieve this object . . . Petrobras . . . ordered the murders of Todd and Michelle."  <u>Id.</u> ¶ 177.  As a result of "these wrongful acts" Plaintiffs "were orphaned and left without their loving parents."

---

[5] Petrobras objects that other actors—and not Petrobras—engaged in these acts.  (Mot. Dismiss Am. Compl., ECF No. 17 at 7–8 ("the Amended Complaint does not contain a single well-pled factual allegation of any act by Petrobras connected to the murders.")).  Because the court dismisses based on the lack of a "direct effect" under FSIA it does not reach the issue of whether the Amended Complaint contains sufficient well-pled facts connecting Petrobras to the murders contain sufficient well-pled facts, or merely makes "threadbare" allegations.  <u>See Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009).  For the purposes of this analysis, it is sufficient to note that regardless of who committed the "acts," they are the acts upon which Plaintiffs' claims are based.

Id. ¶ 179.  Here, the conspiratorial conduct that injured Plaintiffs was the conspiracy to murder Todd and Michelle.  It is what left them without their loving parents, which is their injury. Petrobras' fraudulent investment activities, and the general Petrobras corruption and bribery scheme these activities propped up, led to the conduct that injured Plaintiffs because the motive for the killings was an attempt to silence Todd.  But this does not make the entirety of the Petrobras fraud scheme the gravamen of the case.  Under Plaintiffs' theory of the claim, recovery depends on their ability to prove there was a conspiracy to murder Todd and Michelle.  The Petrobras conspiracy is related antecedent conduct, but it is not the foundation of the claim.

Plaintiffs also bring a claim for intentional infliction of emotional distress.  They allege that what caused them to suffer severe emotional pain was "The brutality of the killings just yards from where Plaintiffs slept, the trauma of finding their parents murdered in their own blood-soaked bed, and the publicized attempt to blame Wesley and Logan for the murders of their own parents."  Id. ¶ 185.  They do not seek to recover for emotional distress caused by the fraudulent financial activities or the broader Petrobras bribery and corruption scheme, and proving the broader scheme would not impact their ability to recover.  The crux of this claim is the murders and their aftermath, not the entirety of the Petrobras corruption and bribery scheme.

Plaintiffs' wrongful death claim is also "based upon" the acts of the murders, the conspiracy before, and the cover-up after, rather than the larger bribery and corruption scheme. Plaintiffs allege the murders were "ordered to conceal and protect Petrobras' illicit, lucrative schemes."  Id. ¶ 173.  But this connection does not mean that the Plaintiffs' action is "based upon" the universe of illegal activity that occurred as part of the financial and political corruption scheme, even though Plaintiffs cite some of these acts in pleading this claim.  See id. ¶ 168. Petrobras' (alleged) act of killing the Stahelis, and not its commercial activities preceding the

murders, form the basis of the Plaintiffs' wrongful death claim.  Under FSIA, this action is "based upon" the acts of the murders, the conspiracy before, and the cover-up after the fact.

> d.  <u>Whether the Lawsuit Is Based Upon Acts Performed in Connection with A Commercial Activity.</u>

FSIA's commercial activity exception permits suit against a foreign state if the action is based "upon an act outside the territory of the United States <u>in connection with a commercial activity of the foreign state</u> elsewhere and that act causes a direct effect in the United States."  28 U.S.C. § 1605(a)(2) (emphasis added).  The FSIA defines "commercial activity" as "mean[ing] either a regular course of commercial conduct or a particular commercial transaction or act.  The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).  A foreign state "engages in commercial activity . . . where it exercises only those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns."  <u>Rosenkrantz</u>, 35 F.4th at 864 (quoting <u>Nelson</u>, 507 U.S. at 360) (cleaned up).

Reflecting the gravamen of this case that is identified above, Plaintiffs state that "At issue in this case are claims arising out of the murders of Todd and Michelle."  (Opp. Mot. Dismiss Am. Compl., ECF No. 22 at 6).  However, in asserting that their claims are in connection with a commercial activity, they further argue that the murders of Todd and Michelle "were conducted at the direction of Petrobras as part of Petrobras' commercial operations; that is, Petrobras . . . caused the deaths of Todd and Michelle Staheli for commercial, and illegal gain."  <u>Id.</u> at 6–7 (citing Am. Compl. ¶¶ 134–43, 165–87).  The "commercial activity" Plaintiffs allege the murders were committed in connection with is far-ranging; as they note in opposing dismissal, the Amended Complaint alleges the murders were "a critical early piece of Petrobras' efforts to conceal the fraud," and here the "fraud" is "a pattern of conduct by Petrobras, its employees and

12

others which led to billions of dollars of losses to its investors, lenders, and joint venture

partners." Id. at 12.  Regardless of the generality of these allegations, the court does not need to

reach the issue of whether Plaintiffs have satisfied the requirement that their suit be based upon

an act Petrobras took in connection with a commercial activity of the foreign state.  This is

because, even if Plaintiffs do satisfy this requirement, as is discussed below, there was no "direct

effect" in the United States of the activities upon which Plaintiffs' claims are based.

      e.   The Lack of a "Direct Effect" in the United States.

Having identified the "based upon" acts, the court turns to the "dispositive question" and

asks "Whether Plaintiffs' claims are based upon an act [Petrobras] took outside the United States

that 'cause[d] a direct effect in the United States.'"  Orient Min., 506 F.3d at 996 (quoting 28

U.S.C. § 1605(a)(2)); see id. at 997 ("The dispositive question . . . is whether this [foreign

sovereign] conduct, taken in [that foreign sovereign's jurisdiction], had a direct effect in the

United States.").

Under FSIA, for this court to have jurisdiction over this dispute, the direct effect caused

by the relevant acts need not be substantial or foreseeable, but it must be more than trivial, and it

will be sufficiently direct if it follows as an immediate consequence of the defendant's activity.

Id. (citing Weltover, 504 U.S. at 617–18).  In determining whether an act produced a direct effect

in the United States, the Tenth Circuit "consider[s] the legally significant acts, as well as other

relevant facts under the circumstances of a given case, to aid [its determination].  In doing so, [it]

look[s] to where the legally significant acts occurred as simply one of several means to

determine whether a direct effect occurred in the United States."  Id. at 998.  But it is not

necessary for the "direct effect" occurring in the United States to be "legally significant" for an

American court to have subject matter jurisdiction under the commercial activity exception's

third clause.  Id. at 997–98.  Similarly, the direct effect need not have been felt by the Plaintiffs;

a direct effect felt by non-parties can also confer jurisdiction, as long as that direct effect

occurred in the United States as a result of the "based upon" acts.  See Atlantica Holdings, 813

F.3d at 111.  The language of the statute also clarifies that the "based upon" acts must have

caused the "direct effect" in the United States for this clause of the commercial activity exception

to apply.  See 28 U.S.C. § 1605(a)(2) ("the action is based . . . upon an act outside the territory of

the United States in connection with a commercial activity of the foreign state and that act causes

a direct effect in the United States.") (emphasis added).  As the Tenth Circuit has observed,

> By its very terms . . . § 1605(a)(2)'s third clause gives American courts subject
> matter jurisdiction over claims stemming from a specific "act" outside the United
> States that has a direct effect in the United States.  In Nelson, the Supreme Court
> contrasted this language with the language in § 1605(a)(2)'s first clause, which
> refers instead to an action based upon a foreign sovereign's commercial activity
> carried on in the United States.

Orient Min., 506 F.3d at 1000 (citing 507 U.S. at 357–58).  For this court to have jurisdiction, it

is not enough for this related antecedent conduct to have caused a direct effect in the United

States.  Under the language of the statute, the "based upon" acts must have had this effect.

With these rules in mind, the court turns to whether the "direct effects" alleged in the

Amended Complaint occurred in the United States and were caused by the "based upon" acts.

The direct effects alleged divide roughly into three buckets: the direct effects on Petrobras; the

direct effects on Petrobras' U.S. joint venture partners, lenders and investors; and the direct

effects on Todd and Michelle's surviving family members.  The court analyzes each in turn.

i.   Effects on Petrobras or its Executives in the United States.

Plaintiffs argue that "As a direct result of the murders of Todd and Michelle Staheli at

Petrobras' direction, Petrobras and its executives received more than a decade of additional

kickbacks, perpetuated by bribery, interference with investigatory efforts, and murder."  (Opp.

14

Mot. Dismiss Am. Compl., ECF No. 22 at 10 (citing Exs. A, B, and D to Am. Compl., ECF No. 16-1, 16-2, 16-4; Am. Compl., ECF No. 16 ¶¶ 31–41, 84–98, 100–06)).  But there is no indication that these effects (e.g., the kickbacks) occurred in the United States.  This "direct result" of the "based upon" acts is consequently not a "direct effect" within the meaning of the statute that would give this court jurisdiction over this case.

　　　　　　ii.  Effects on U.S. Investors and U.S.-Based Joint Venture Partners.

　　　　Plaintiffs also assert the existence of a "direct effect" on U.S. investors and joint venture partners and lenders.  (See Opp. Mot. Dismiss Am. Compl., ECF No. 22 at 10 ("These efforts defrauded U.S. investors and U.S.-based joint venture partners of billions of dollars.").  Specifically, Plaintiffs allege that "The direct effects in the United States were felt . . . by Petrobras' U.S. joint venture partners, lenders, and investors [the "U.S. financial actors"], whose investments with Petrobras were used as an opportunity to defraud the companies and their shareholders via bribes and kickbacks—which Petrobras concealed by murdering the person responsible for investigating the suspicious activity in some of Petrobras' joint ventures."  Id. at 14–15.  As "an FSIA plaintiff need only show a direct effect on someone in the United States, plaintiff or not," Fontana v. Republic of Argentina, 962 F.3d 667, 673 (2d Cir. 2020) (citing Atlantica Holdings, 813 F.3d at 111), that the U.S. financial actors are not parties in this case is not relevant to the jurisdictional question.

　　　　However, the "direct effects" alleged to have occurred in relation to the U.S. financial actors are effects of the larger bribery and corruption scheme.  They are not direct effects of the "based upon" acts, so they cannot establish the needed "direct effect" jurisdictional nexus requirement for this court to have subject matter jurisdiction.  See Orient Min, 506 F.3d at 999–1000 (stating, where state defendant Bank's commercial activity included multiple instances of

commercial activity outside the United States, that only those instances of commercial activity that plaintiffs' claims were "based upon" satisfied the "direct effect" jurisdictional nexus requirement).  For example, Plaintiffs argue that "The commercial damage caused by Petrobras' fraudulent conduct is readily demonstrated" by Petrobras' agreements to settle claims with former U.S. investors, the SEC, and the DOJ, and Petrobras' admissions to fraudulent conduct in the NPA.  (Opp. Mot. Dismiss, ECF No. 22 at 15).  But these agreements, as well as the NPA, are related to (and admissions of) bribery and embezzlement schemes, false books and records, and insufficient internal controls, not murder or conspiracies to commit murder or to cover it up.  (See, e.g., Ex. D to Am. Compl., ECF No. 16-4 (detailing NPA between DOJ and Petrobras)).

Reflecting this, it is where plaintiffs have brought cases seeking compensation for commercial and financial damage that courts have found that allegations of Petrobras' fraudulent investment-related conduct satisfy FSIA's "direct effect" requirement.  See EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro S.A., 246 F. Supp. 3d 52, 71–73 (D.D.C. 2017), aff'd, 894 F.3d 339 (D.C. Cir. 2018).  In EIG, defrauded investment funds brought fraud, aiding and abetting fraudulent inducement, and civil conspiracy to defraud claims against Petrobras and others.  Id. That fraudulent inducement had a direct effect in the United States—namely, the injury to the funds occurred in part in the United States (where six of the eight funds are organized), at the time Petrobras induced the funds to invest in the doomed Petrobras-Sete Project.  Id. Specifically, the court held that "alleg[ations] that Petrobras targeted U.S.-based entities to invest in the Petrobras-Sete project, and fraudulently induced the U.S.-based Funds to invest in that project by, among other things, failing to disclose the existence of a premeditated bribe scheme in materials used to market the project in the United States" "[we]re sufficient to establish a 'direct effect' and satisfy Clause Three of commercial activity exception."  Id.  The Plaintiffs in

this case identify similar conduct—Petrobras' financial malfeasance—as causing a "direct effect" in the current action.  (See Opp. Mot. Dismiss Am. Compl., ECF No. 22 at 15).  But here, unlike in EIG, Plaintiffs have not based their complaint upon fraudulent investment schemes.  Because of this difference in what this case and EIG are "based upon," the fraudulent investment schemes' effects in the United States do not satisfy the "direct effect" requirement here, as it did in EIG.

To tie the "based upon" acts in this case (the murders, the conspiracy before, and the cover-up after) to the broader bribery and corruption scheme, Plaintiffs argue the murders were committed "so that Petrobras could continue defrauding its U.S. investors and its U.S. joint venture partners and lenders for over another decade."  (Opp. Mot. Dismiss Am. Compl., ECF No. 22 at 15; see also Am. Compl, ECF No. 16 ¶¶ 126, 136–40, 143, 168) (alleging the murders were committed "to prevent Todd from revealing the massive bribery, kickback and corruption scheme" perpetrated by Petrobras)).  This is not an allegation of a "direct effect" within the meaning of FSIA, it is an allegation of motive.  But Plaintiffs also allege that Petrobras' involvement in the murders "concealed [its] fraudulent conduct from its joint venture partners and investors in the United States."  (Opp. Mot. Dismiss Am. Compl., ECF No. 22 at 10, 15).

As a preliminary matter, Plaintiffs' assertion that the murders concealed the Petrobras fraud is contradicted by their assertions about what Todd did with his knowledge of the Petrobras corruption and bribery scheme before he was killed.  The Amended Complaint indicates that before Todd was killed, he acted on this information to secure Shell's interests and put in place policies and procedures that challenged the corruption scheme.  (See Am. Compl, ECF No. 16 ¶ 41 (alleging that Todd "took steps to prevent further financial harm to Shell" upon discovering the fraud and that "just as" this occurred, he and Michelle were killed); id. ¶ 138 (asserting Todd

17

was murdered "Just as he began to take swift actions to limit Shell's exposure, including implementing new policies and procedures for the [joint ventures] with Petrobras that would prevent the payment of bribes and kickbacks."); id. ¶ 135 (asserting "Todd's efforts to stop cost overruns ended up costing Petrobras millions of dollars in kickbacks and bribery payments they could no longer control and threatened the continued viability of the entire corruption scheme.")).  These facts indicate that before he was killed Todd was able to act on his discovery and implement changes at Shell, not that he was prevented from doing so.

But even if Petrobras' involvement in the murders did conceal its fraudulent conduct, and the court expands the "based upon" acts to include "silencing Todd," this would not mean that Plaintiffs have pled a "direct effect" within the meaning of FSIA.  To find that the "based upon" acts caused an effect on the U.S. financial actors, speculative steps beyond the allegations in the pleadings need to be taken, meaning the effects of the murders was not direct.  Put differently, based on the facts alleged in the Amended Complaint, Todd and Michelle's deaths, the conspiracy before, the cover-up after, and the fact of Todd's silence as a result of his death caused no direct effect on the U.S. financial actors.  To get to a "direct effect" of the murders on the U.S. financial actors the court must speculate that, had he lived, Todd would have revealed more about, or done more to challenge, the Petrobras corruption and bribery scheme than he had revealed by November 29, 2003, the last day he was alive.  Had Todd lived but not revealed any more about the corruption scheme than he had on November 29, 2003, or had he lived but not put additional anti-corruption measures in place than he had on November 29, 2003, Petrobras' investors would have found themselves in the same situation as they arrived at following his sudden and tragic death.  Further, to find a direct effect the court must also assume that Todd's hypothetical revealing of or acting upon on that information, would have had effected the U.S.

financial actors; his actions in Brazil alone, even if they included whistleblowing, would not necessarily create an injury or direct effect in the United States.  See Virtual Countries, Inc. v. Republic of S. Afr., 300 F.3d 230, 238 (2d Cir. 2002) (observing speculative injuries do not suffice to satisfy 28 U.S.C. § 1605(a)(2)'s third clause).

These hypotheticals highlight that the "based upon" acts only cause a "direct effect" on the U.S. financial actors by way of intervening elements and speculation.  See EIG, 246 F. Supp. 3d at 71 (first quoting Weltover, 504 U.S. at 618; then quoting Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela, 784 F.3d 804, 817 (D.C. Cir. 2015)) ("A 'direct effect' is one that 'follows as an immediate consequence of the defendant's . . . activity.'  Stated another way, it 'is one which has no intervening element, but, rather, flows in a straight line without deviation or interruption.'").  The direct effects of the broader Petrobras fraud on the U.S. financial actors were not caused by the gravamen of the case, and cannot satisfy the jurisdictional nexus requirement.

### iii.   Effects in the United States on the Surviving Staheli Family Members.

Plaintiffs argue that "The brutal murders . . . devastated the Staheli family by leaving four children, all under the age of 14 at the time, orphans in a foreign country."  (Opp. Mot. Dismiss Am. Compl., ECF No. 22 at 10) (citing Am. Compl., ECF No. 16 ¶¶ 165–87).  It was Logan, "then only ten years old, [who] found his father's lifeless body and his mother struggling for breath" after they were attacked.  (Am. Compl., ECF No. 16 ¶ 47).  After the children discovered their dead and dying parents, the police in Rio "tried to pin the killings on the two oldest children—Wesley, 13, and Logan."  Id. ¶¶ 50, 54.  The Rio police "prevent[ed] them from leaving Brazil in the immediate aftermath of the murders."  Id. ¶ 56.  And "It took eleven days of legal fights . . . before a court finally allowed the children to leave the country."  Id. ¶ 59.

19

There is no question that the "based upon" acts' effects on the Plaintiffs were immediate, direct, and horrific.  But the language of FSIA requires a "direct effect" in the United States for this court to have jurisdiction over Petrobras.  Because Plaintiffs were in Brazil when their parents were murdered, and because they were kept there in the traumatic aftermath while they were being publicly blamed for their parents' murder, the effects on the Plaintiffs in the United States were necessarily indirect or not immediate, and their American citizenship is not enough to establish a direct effect.  See Big Sky Network Canada, Ltd. v. Sichuan Provincial Gov't, 533 F.3d 1183, 1190 (10th Cir. 2008).  Other Staheli family members were undoubtedly also devastated by Todd and Michelle's murders.  That they are not parties to this action is not relevant to the jurisdictional analysis.  See Atlantica Holdings, 813 F.3d at 111.  The Amended Complaint alleges that Todd's parents and Michelle's sister and brother flew to Rio to take the children back to the United States.  (See Am. Compl., ECF No. 16 ¶ 57).  But it does not allege that that they departed for Rio from the United States, so this action cannot provide the "direct effect" in the United States that FSIA requires.  The murders of Todd and Michelle, the conspiracy to murder them, and the cover-up of their murders had devastating effects on the Staheli family.  But these effects do not give the court jurisdiction over this action under FSIA's commercial exception clause because of the statute's jurisdictional nexus requirement.

    f.   Conclusion.

"At the threshold of every action in a district court against a foreign state . . . the court must satisfy itself that one of [FSIA's] exceptions applies, as subject-matter jurisdiction in any such action depends on that application."  Orient Min., 506 F.3d at 991 (quoting Altmann, 541 U.S. at 691) (cleaned up).  Although the murders of Todd and Michelle Staheli were a tragedy for their family—and especially their children, who are the Plaintiffs in this action—this court

lacks the authority to hear Plaintiffs' claims against Petrobras.  This is because of the court's

finding that, even assuming that all of the facts pled in Plaintiffs' Amended Complaint are true,

there is no "direct effect" in the United States caused by the acts upon which this action is based,

as that term is construed in the context of FSIA.  Because of this lack of jurisdictional nexus, the

commercial activity exception does not apply, and the court does not have subject matter

jurisdiction over this action.  Because the court has found it lacks subject matter jurisdiction, it

does not consider Petrobras' other arguments for dismissal.  It dismisses Plaintiffs' claims

without prejudice.  Brereton v. Bountiful City Corp., 434 F.3d 1213, 1216 (10th Cir. 2006)

("where the district court dismisses an action for lack of jurisdiction . . . the dismissal must be

without prejudice.").

## ORDER

For the reasons discussed above, the court ORDERS as follows:  Petrobras' Motion to

Dismiss the Complaint (ECF No. 11) is dismissed as MOOT.  Petrobras' Motion to Dismiss the

Amended Complaint is GRANTED on the grounds that the court lacks subject matter

jurisdiction.  Plaintiffs' Amended Complaint is DISMISSED WITHOUT PREJUDICE.

DATED this 31st day of July, 2023.

BY THE COURT:

_____
TENA CAMPBELL
United States District Judge